Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1556 | **DATE** | 3/9/2000 |
| **CASE TITLE** | CSC Holdings, Inc. vs. KDE Electronics Corp., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Judgment is entered in favor of Plaintiff and against Defendants in the amount of $254,236.55 plus attorneys' fees and costs. Defendants are enjoined from sale, transfer, advertisement, offer for sale, modification and/or manufacture of cable television decoding devices and related equipment. Plaintiff has leave to destroy Defendants' inventory. Defendants' motion to vacate (33-1, 33-2) denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 10 2000 | |
| | Notified counsel by telephone. | | date docketed | 39 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | ETV | courtroom deputy's initials | 3/9/2000 date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CSC HOLDINGS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KDE ELECTRONICS CORPORATION, ) <br> DONALD MALIK, TAMARA MALIK, ) <br> NANCY JOHNSON, JOHN DOES ) <br> 1-10, JANE DOES 1-10, UNIDENTIFIED ) <br> CORPORATIONS 1-10 AND UNIDENTI- ) <br> FIED BUSINESS ENTITIES 1-10, ) <br> ) <br> Defendants. ) | No. 99 C 1556 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff CSC Holdings, Inc. ("CSC") brought this action for an injunction and damages against KDE Electronics Corporation ("KDE"); Donald Malik, KDE's President and Co-owner; Tamara Malik, KDE's Secretary and Co-owner; and Nancy Johnson, an employee of KDE. CSC alleges that Defendants engaged in the prohibited manufacture, sale and distribution of "pirate" cable television converter-decoders, descrambling devices, and related equipment for the purpose of assisting in the unauthorized reception and theft of Cablevision's cable television programming services in direct violation of the Cable Communications Policy Act of 1984, 42 U.S.C. § 553. Plaintiff also alleges supplemental state claims for violations of 720 ILCS 5/16-10. Having heard testimony and the arguments of both Plaintiff and Defendants, and having received evidence presented by Plaintiff, the court issues the following findings of fact and conclusions of law, and enters judgment in

favor of CSC.

## FINDINGS OF FACT

### A. Plaintiff's Business

CSC, a Delaware corporation, is a national multiple cable system operator that owns and operates numerous cable systems in New York, Connecticut, Massachusetts, New Jersey, Ohio, and Michigan.

Cablevision, CSC's trade name, provides cable television services to subscribers who request and pay for the services. Cablevision offers its programming services in a variety of "packages" for a monthly rate. Subscribers may also elect to purchase certain "premium" programming services such as Cinemax, Home Box Office, and Showtime for an additional monthly charge per service. Additional individual programs, such as sporting events or movies, are offered on a pay-per-view basis, reflecting a cost over and above the subscriber's regular monthly fee. Each subscriber is entitled to receive only those programming services he or she elects to purchase.

The signals for most of Cablevision's cable television services are received via satellite and retransmitted from Cablevision's satellite reception facilities to subscribers' homes through a network of cable wiring and equipment (the "System"). In order for a subscriber to receive services, Cablevision provides each subscriber with a device known as a converter, which translates the multiple signals simultaneously transmitted over the System into different channels for viewing by subscribers. To prevent subscribers from receiving programming services for which they have not paid, Cablevision encodes or "scrambles" the

signals for its premium and pay-per-view programming. Subscribers purchasing such scrambled programming services are provided with a device known as a "descrambler" or "decoder" which is incorporated into the converter. The descrambler decodes the scrambled service so that the programming selected and purchased can be viewed clearly on the subscriber's television set. Encoded programming services not purchased by an individual subscriber will continue to be scrambled and unviewable to that subscriber.

Plaintiff's systems are "addressable," meaning that the converter-decoder that Cablevision provides each subscriber is programmed by a central computer to enable the reception of only those programming services specifically selected and purchased by individual subscribers. Scrambling is Plaintiff's primary security method used to prevent subscribers from receiving services for which they have not paid. Only by tampering with Plaintiff's equipment or installing an unauthorized or "pirate" converter-decoder, illegally programmed to descramble all of Plaintiff's programming services, can an individual receive Plaintiff's programming services without payment.

Theft of cable television services has a negative impact on the governmental units in the areas serviced by Cablevision as they derive franchise fees from a cable operator's gross revenues. The lost revenues to cable operators adversely affects the ability of those operators to purchase and maintain a high quality of programming services for their subscribers. Furthermore, the maintenance of unauthorized connections and use of pirate converter-decoders may result in signal leakage, which violates FCC regulations and for which Cablevision may suffer the imposition of fines and other sanctions.

## B. Defendant's Business

KDE is an Illinois corporation having had a business and a mailing address at 367 S. Rohlwing Road, Unit C, Addison, Illinois, 60101, P.O. Box 1494, Addison, Illinois 60101, and 9823 Garden Court, Schiller Park, Illinois 60176. Donald Malik was the president and co-owner of KDE; Tamara Malik was the secretary and co-owner of KDE; and Nancy Johnson was an employee of KDE.

Defendants engaged in the business of selling cable television decoders or descramblers for profit. Defendants advertised and marketed their products through magazines with nationwide circulation. Defendants sold their converter-decoders to persons who called their toll-free number included in the advertisements, and provided installation instructions to purchasers of the equipment.

At least some of the advertisements and KDE's price list included the phrase "No Illinois Sales." Refusing to sell into the home state is a common business practice of pirate decoder vendors who seek to reduce the risk of prosecution by local law enforcement authorities and cable operators by not selling devices for use on cable systems in the state where they are located.

Sometime after the initiation of this suit, Defendant Donald Malik wound up the business of KDE and no longer engages in the sale of descramblers.

## C. Plaintiff's Investigation of Defendants

In or around March 1998, Plaintiff became aware of Defendants' pirate decoder sales operation. At that time, Joseph Flaim ("Flaim"), a security investigator employed by

4

Plaintiff, initiated an investigation of Defendants.

Flaim's investigation of Defendants began in March 1998 and concluded in February 1999. The investigation consisted of several telephone calls to Defendants' toll-free number, the purchase of three pirate descramblers which could be used in Cablevision's New York service areas, and surveillance at Defendants' business location.

During a number of phone conversations with Defendants Donald Malik and Nancy Johnson, Flaim was told that with the descrambling device provided by Defendants, Flaim would be able to receive all premium and pay-per-view channels. When questioned about whether the cable company could detect the use of the device, Defendants told Flaim that the device could not be detected because it was "non-addressable." Defendants also recommended to Flaim that he buy a search protector, which Defendants indicated would prevent the cable company from detecting anything through the cable wire.

Flaim observed numerous daily pickups and deliveries by United Parcel Service of packages which appeared to contain pirate decoding devices.

The decoders purchased by Flaim were tested and found to be capable of descrambling and permitting viewing of all of Cablevision's programming services, including premium and pay-per-view services.

### D. The Present Action

On March 9, 1999, Plaintiff brought this action against Defendants for injunctive relief and monetary damages on account of Defendants' statutorily prohibited modification, sale and distribution of pirate cable television descrambling devices.

At the outset of the action, on an ex parte basis, Plaintiff sought a temporary restraining order (the "TRO"). On March 18, 1999 this court granted the TRO which, among other things, directed the U.S. Marshal Service to seize Defendants' business records and a sample of pirate decoding devices from their business location. The TRO also provided for a restraint on assets pending a decision in this action, as well as a prohibition against Defendants' future sales of pirate decoding devices.

The court ordered Defendants to appear and show cause why a preliminary injunction continuing the terms of the TRO should not be entered against them on March 24, 1999. Defendant Donald Malik appeared without counsel at the hearing. Plaintiff introduced a number of exhibits into evidence, including samples of Defendants' descrambling devices. Plaintiff also called and examined its expert witness, Stan Durey ("Durey"), Director of Security for a company that provides anti-piracy activities on behalf of cable system operators. Upon examination of sample descramblers sold by Defendants, Durey established that the non-addressable devices sold by Defendants have only a single purpose: to enable a user to receive and unscramble encoded signals without notifying the signal provider or paying for the services. Durey also established that the non-addressable devices were also immune to "Bullets," or countermeasures used by cable companies to detect and/or disable pirate devices attached to their systems. At this hearing, the court continued the relief granted in the TRO for an additional ten days, and thereafter continued the TRO on several occasions at least through May 6, 1999.

On May 6, 1999 the court held a hearing on Plaintiff's motion for preliminary

injunction.[1]    At this hearing, Defendants, now represented by counsel, cross-examined Durey.  Although not specifically reflected in the transcript of this hearing, the court confirmed the relief, thus converting the TRO to a preliminary injunction.

On May 19, 1999, Plaintiff deposed Defendants Donald Malik, Tamara Malik and Nancy Johnson.  During their depositions, each Defendant exercised his or her Fifth

---

[1]    At this hearing, Defendants' counsel moved to vacate or modify the TRO. The court denied the motion without prejudice pending defendants' compliance with accounting provisions of the TRO.  Defendants renewed the motion on June 24, 1999.  As of the date of this opinion, the court had not ruled on this motion.  The court need not now rule on this motion as it is moot upon the entering of the judgment today.  Nevertheless, the court responds briefly to Defendants' argument that under the U.S. Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961 (1999) the court improperly froze Defendants' assets.

*Grupo Mexicano* involved investors who purchased notes issued by Grupo Mexicano, a Mexican holding company involved in toll road construction.  When Grupo Mexicano defaulted on its notes, the investors sued for money damages and sought a preliminary injunction restraining Grupo Mexicano from assigning its assets so that it would be able to pay its debts. The Supreme Court reversed the grant of the injunction, stating that "a general creditor (one without a judgment) ha[s] no cognizable interest, either at law or in equity, in the property of his debtor[.]"  *Grupo Mexicano*, 119 S.Ct. at 1968.  In distinguishing an earlier case where the plaintiffs sought equitable relief, the Court noted "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." *Id.* at 1971 (discussing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)).  Ultimately, the Court held that the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions preventing a party from disposing of assets pending adjudication of a contract claim for money damages. *Id.* at 1975.

Here the court properly froze Defendants' assets; Plaintiff sought equitable relief, and the relief granted was a reasonable measure designed to preserve the status quo in aid of the ultimate equitable relief claimed.  *See e.g., U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498-99 (4th Cir. 1999) (distinguishing the money damage claim addressed in *Grupo Mexicano* from the equitable claim presented there); *F.T.C. v. Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715, at *3 n.2 (N.D. Ill. Aug. 5, 1999) (same); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F.Supp.2d 199, 202 (D.Mass. 1999) (same).

7

Amendment privilege against self-incrimination, declining to answer any questions.

On August 5, 1999 the court conducted a bench trial in this matter. At the trial, Plaintiff entered evidence consisting of KDE income statements, Plaintiff's rate booklets, Plaintiff's franchise areas, KDE invoices for the purchase of converters by Plaintiff's customers, and transcripts of the depositions of Donald Malik, Tamara Malik and Nancy Johnson. Defendants offered no rebuttal evidence in the way of affidavits, testimony or otherwise. Instead, Defendants merely argued that the descramblers have a legitimate use, and therefore Plaintiff could not prove the requisite intent for a finding of liability under 47 U.S.C. § 553. At the trial, Plaintiff withdrew its request for actual damages, indicating only that it sought profits, costs and fees, damages, a permanent injunction, and permission to destroy the inventory of decoding equipment seized from Defendants. The parties also stipulated to an amount of profits totaling $254,236.55 for the years 1995 through 1998 inclusive. Defendants did not object to the entry of a permanent injunction or to the destruction of KDE's remaining inventory.

## CONCLUSIONS OF LAW

A.     **Liability Under Section 553 of the Federal Communications Policy Act**

Section 553(a)(1) of the Federal Cable Communications Policy Act of 1984 prohibits any person from "intercept[ing] or receiv[ing] or assist[ing] in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). Section 553(a)(2) provides that the phrase "assist in intercepting or receiving"

8

includes "the manufacture or distribution of equipment intended by the manufacturer or distributor... for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1)." 47 U.S.C. § 553(a)(2). To establish liability under Section 553(a)(2), the plaintiff must show: (1) that Defendants manufactured or distributed a device or equipment (2) that Defendants intended be used for the unauthorized reception of cable services. *See id.* Section 553 allows this court to entertain a civil action brought by "[a]ny person aggrieved by any violation of subsection (a)(1) of this section[.]" 47 U.S.C. § 553(c)(1).

Defendants' liability is straightforward: the evidence clearly establishes that Defendants distributed decoders intended for the unauthorized reception of cable services. Defendants sold decoders that had been modified so as to render their addressability feature inoperative, provided hook-up instructions to purchasers, and represented to purchasers that the devices enabled the user to receive all premium and pay-per-view programming services. *See TKR Cable Co. v. Cable City Corp.*, No. 96 C 2877, 1996 WL 465508, at *7 (D.N.J. July 29, 1996) (entering injunction on similar facts; "the bullet busters or bullet protectors offered by defendants which defeat security measures of the cable companies clearly show the defendants' intent to assist in the theft of cable television services."). Defendants sold these decoders with the specific knowledge or intent that KDE's customers do not pay the cable company for the enhanced programming -- e.g. the descramblers were modified to descramble premium and pay-per-view services, the devices were non-addressable and were immune to cable operator countermeasures. *See Continental Cablevision, Inc. v. Poll*, 124 F.3d 1044, 1047

9

(9th Cir. 1997) (inferring intent from modifications in the equipment sold by defendant, manner and method of advertising, and fact that equipment was "non addressable" and "bullet proof"); *U.S. v. Gardner*, 860 F.2d 1391, 1396-97 (7th Cir. 1988). Specifically, Nancy Johnson told Flaim that the cable company would not be able to detect the device because it was "non-addressable" and recommended that Flaim purchase a search protector which she indicated would prevent the cable company from knowing about the device. Further, Durey established that non-addressable descramblers immune from "bullets" have the sole purpose of providing unfettered and unauthorized access to cable services.

Defendants submitted no rebuttal evidence; instead, they merely argued theoretical legitimate uses of the decoders. For example, Defendants at trial analogized the use of the decoder to the use of phone extensions; having the decoder would enable a cable subscriber with several televisions to view different shows on the various television sets. Without the extra decoders, an owner of five television sets could only view the same program at any given time on all five sets. Even if this theoretical use of a decoder is legitimate, the evidence presented by Plaintiff, and already discussed by the court, clearly establishes Defendants' intent to assist in the unauthorized reception of cable services. "The defendants have simply not produced any evidence of legitimate sales of decoders[.]" *Cablevision Sys. Corp. v. Muneyyirci*, 876 F.Supp. 415, 419 (E.D.N.Y. 1994). The court's liability determination is further supported by the fact that the individual Defendants have asserted their privilege against self-incrimination. *See Baxter v. Palmigiano*, 425 U.S. 308 (1976) (in a civil action, the fact finder may draw an adverse inference from a party's assertion of his or her privilege

against self-incrimination); *TCI Cablevision of New England v. Pier House Inn, Inc.*, 930 F.Supp. 727, 728 (D.R.I. 1996) (drawing adverse inference in cable piracy case from the defendants' invocation of their Fifth Amendment rights).

The court finds in favor of Plaintiff and against Defendants on Count I of the Complaint for violation of 47 U.S.C. § 553.[2]

### B. Award of Defendants' Profits

Once liability is determined, the court has the authority to award to the aggrieved party "any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages[.]" See 47 U.S.C. § 553(c)(3)(A)(i). All of Defendants' profits may be awarded to Plaintiff, whether or not such profits were derived from the sale of pirate decoders into Plaintiff's system areas. *See* H.R. No. 98-934, 98th Cong. 2d Sess. 85 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4721 ("The aggrieved party. . . may recover . . . all profits of the violator attributable to the violation, including those profits attributable to the violation where it also occurred outside the local area of the individual cable system[.]"); *see also Time Warner Entertainment/Advance-Newhouse Partnership v. Worldwide Electronics, L.C.*, 50 F.Supp.2d 1288, 1300-01 (awarding to plaintiff all of defendants' profits from their pirate decoder business, regardless of the sale of pirate decoders outside the plaintiff's service area).

---

[2] The court sua sponte dismisses Count II of Plaintiff's Complaint alleging violations of 720 ILCS 5/16-10 *et seq*. This is a criminal statute that provides no private right of action. *See* 720 ILCS 5/16-10.

11

The court has determined that Defendants are liable for having violated Section 553. As the parties have stipulated to the amount of profits, the court enters judgment in favor of Plaintiff for the amount of $254,236.55, representing KDE's profit and Donald Malik's salary for the years 1995 through and including 1998.

C.  **Enhanced Damages**

In its discretion, the court may increase the award of damages by an amount not exceeding $50,000 where the court concludes "that the violation was committed willfully and for purposes of commercial advantage or private financial gain[.]" 47 U.S.C. § 553(c)(3)(B). Courts have awarded enhanced damages in cases where the defendant has committed violations of Section 553 willfully and for purposes of commercial advantage or private financial gain. *See Poll*, 124 F.3d at 1049; *Worldwide Electronics*, 50 F.Supp.2d at 1301-02. The cases that have held that the interception of unauthorized services was for financial gain usually involve defendants who sell the prohibited devices to cable services, rather than individual subscribers. *See American Cablevision of Queens v. McGinn*, 817 F.Supp. 317, 320 (E.D.N.Y. 1993). The standard for willfulness in a civil case is lower than that in a criminal case, requiring proof only of "a disregard for the governing statute and an indifference to its requirements." *See Trans World Airlines v. Thurston*, 469 U.S. 111, 127 (1985).

Although the court concludes that Defendants acted willfully in conducting the business of selling decoder devices, and acted for the purpose of financial gain, the court, in its discretion, declines to assess enhanced damages against Defendants. KDE is a relatively small time operator netting profits of approximately $250,000 over four years. It is unlikely

12

that Plaintiff would be able to exact payment from Defendant for enhanced damages. Moreover, enhanced damages are not needed to put an end to Defendants' illegal conduct, as KDE is no longer in operation.

D. Attorney's Fees and Costs

Also within its discretion, the court may "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 553(c)(2)(C). Full costs may also include recovery of investigative costs. *See Worldwide Electronics*, 50 F.Supp. at 1302. Although an award of attorney's fees is not needed to put an end to Defendants' illegal conduct, *see id.*, the court believes that Plaintiff should not have to bear the burden of investigating and "prosecuting" Defendants' illegal conduct. The court therefore awards Plaintiff recovery of its reasonable attorneys' fees and investigative costs in an amount to be determined after submission of documentation of fees and expenses.

E. Injunctive Relief

Section 553 expressly authorizes the issuance of temporary and final injunctive relief in order to prevent a defendant from continuing to violate the statute. Specifically, the statute provides: "[t]he court may... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section." 47 U.S.C. 553(c)(2)(A). When express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites of such relief, so long as the statutory conditions are met. *See F.T.C. v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951).

The court has determined that Plaintiff established Defendants' liability under Section 553, and Defendants do not object to the issuance of a permanent injunction. Moreover, the issuance of a permanent injunction will further the public interest by preventing conduct Congress declared to be illegal in Section 553. *See Intermedia Partners Southeast v. QB Distributors, L.L.C.*, 999 F.Supp. 1274, 1284 (D.Minn. 1998). The court hereby enters a permanent injunction against Defendants, directing that they refrain from modifying and selling or otherwise distributing any equipment for unauthorized reception of any communication services offered over a cable system.

For the foregoing reasons, the court enters judgment in favor of Plaintiff and against Defendants in the amount of $254,236.55 plus attorneys' fees and costs. The court further permanently enjoins Defendants, their agents, employees, and affiliates from the sale, transfer, advertisement, offer for sale, modification and/or manufacture of cable television decoding devices and related equipment. The court further grants Plaintiff leave to destroy Defendants' inventory of such devices and related equipment.

ENTER:

Dated: March 9, 2000

REBECCA R. PALLMEYER
United States District Judge